# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00509-CV

---

**Timothy Sellars, Appellant**

**v.**

**Mark Highfill, in His Capacity as Personal Representative of the Estate of David Highfill (Deceased), Appellee**

---

### FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY
### NO. C-1-PB-19-001030, THE HONORABLE GUY S. HERMAN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Timothy Sellars was seriously injured when he collided with a vehicle driven by David Highfill that slid into his vehicle's path on a highway. After a jury verdict, the trial court rendered a take-nothing judgment on Sellars's negligence claim against Mark Highfill as personal representative of David Highfill's estate.[1] Sellars contends that the trial court erred by allowing Sellars's expert to testify on cross-examination that he found credible an eyewitness's report of a third vehicle's involvement and by letting Highfill play excerpts of depositions in closing argument. He contends further that this Court erred by denying his motion to correct the reporter's failure to transcribe those segments. We will affirm the judgment.

---

[1] We will refer to both Mark and David as "Highfill," though Mark was not in the vehicle during the accident and David died before the litigation was filed. Context will make clear which Highfill is meant.

# BACKGROUND

Highfill undisputedly lost control of his vehicle and slid across the median of Texas Highway 71 in Bastrop into the path of Sellars's vehicle. Unable to avoid the collision at highway speeds, Sellars hit the driver's side of Highfill's vehicle. Highfill died at the scene, and Sellars suffered several broken bones and other injuries.

Sellars sued, alleging Highfill was negligent and grossly negligent. Highfill claimed that Sellars's damages were caused by a third driver whose actions caused Highfill to lose control of his vehicle.

Both sides called live witnesses and played excerpts of video depositions during the evidentiary portion of the case. An ambulance driver who was in front of Sellars testified as to what he saw of the accident and discussed the video from his dash cam; he said he saw Highfill's vehicle cross the median and then, in his side mirror, saw Highfill's car hit by Sellars's vehicle. Jimmy Voigt, who was driving behind Highfill, testified that a third vehicle[2] entered the highway, crossed a lane of traffic, and moved three-quarters of the way into Highfill's traffic lane, causing Highfill to swerve left. The third vehicle did not contact Highfill. Sellars's accident-reconstruction expert witness Lee Jackson testified that he found the eyewitness credible and that he included the third vehicle in his reconstruction. Jackson, however, disagreed with the eyewitness's opinion that Highfill never briefly regained control of the vehicle. Jackson concluded that Highfill did not lose control of his vehicle when he moved left to avoid the encroaching third vehicle but did when he overcorrected as he returned to his original travel lane. Sellars testified and Jackson agreed that Sellars could not have avoided Highfill, and the trial

---

[2] Several other vehicles were near Sellars and Highfill. References to the "third vehicle" concern the only vehicle other than Sellars's and Highfill's alleged to have had any role in the collision.

court did not submit a jury question about Sellars's responsibility. There was testimony about Sellars's injuries; his multiple surgeries; his rehabilitation; and the previous and continuing physical, emotional, and financial toll of the collision. Over Sellars's objection, Highfill replayed excerpts from video depositions during his closing argument.

The jury found that Sellars incurred over $2 million in past and future damages, that Highfill was not negligent, and that an unknown (John Doe) driver of an additional vehicle was negligent; the jury did not apportion responsibility because it found only the unknown driver negligent. Accordingly, the trial court awarded no damages to Sellars from Highfill.

## DISCUSSION

**1. The trial court did not err reversibly by overruling Sellars's objections to his expert's testimony that the expert found Voigt's eyewitness testimony credible and believable.**

By his first issue, Sellars contends that the trial court erred by overruling his objections and allowing his own expert to testify that he found the eyewitness Voigt's testimony about the third vehicle's involvement credible. We conclude that any error in the admission of the testimony was harmless.

The admission or exclusion of evidence is committed to the trial court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A party seeking to reverse a judgment based on the admission or exclusion of evidence must show that the evidence was erroneously admitted or excluded and that the error probably caused rendition of an improper judgment. *Id.*; *see also* Tex. R. App. P. 44.1(a)(1); Tex. R. Evid. 103(a). A successful challenge to evidentiary rulings usually requires the complaining party to show the judgment turns on the particular evidence excluded or admitted. *Alvarado,* 897 S.W.2d at

3

753-54. We determine whether the case turns on the excluded evidence by reviewing the entire record. *Id.* at 753.

During direct examination, Jackson testified that he was a hired a year after the accident and did not do any independent measurements of the scene. He said he reviewed evidence including the Bastrop police department's crash report and its investigative packet; the manual for filling out the crash report; the depositions of investigating officer Daniel McManus, Mark Highfill, Voigt, and Sellars; an affidavit from Lloyd McNutt (a driver behind Sellars who spoke to police investigators); and the EMS dash-cam video. Jackson noted that the Bastrop Police report did not mention a third vehicle. He also noted Voigt's observation that Highfill did not contact the third vehicle and did not leave the road when he initially swerved to avoid the third vehicle. Jackson faulted Highfill for overcorrecting after initially avoiding the third vehicle:

Q. Do you recall what Mr. Voigt said about Mr. Highfill's correction while he was driving down the roadway?

A. Yes, he said he overcorrected.

Q. What does it mean to say a driver overcorrected?

A. As we've all done before, when you're going down the road, there's steering input in order to make the car go whatever direction you want it to. Overcorrecting is when you put in too much steer and you lose control of the vehicle.

Q. Based on what you've seen, did Mr. Highfill overcorrect to avoid the SUV?

A. No. He moved to the left to avoid the SUV, and then he overcorrected back to the right.

Q. So was it the move to the left that caused Mr. Highfill to lose control of his vehicle?

4

A. No, it was the overcorrection to the right that caused him to lose control of the vehicle.

Q. So what caused him to lose control of the vehicle?

A. The steering input of the driver.

Q. Who put that steering input into the vehicle?

A. Mr. Highfill did while he was driving.

Q. So after he lost control of his vehicle, was Mr. Highfill ever able to regain control of his vehicle?

A. No.

Sellars objected during the following exchange about eyewitness Voigt during Highfill's cross-examination of Jackson:

Q. You'll agree with me that Mr. Voigt saw an SUV get onto the highway and get all the way over into Mr. Highfill's lane?

A. Yes, he did get on the highway, partially into Mr. Highfill's lane, yes.

Q. You don't dispute Mr. Voigt's testimony about what he saw, do you?

A. No.

Q. In fact, I think you testified that you thought Mr. Voigt was a credible witness?

[SELLARS'S COUNSEL]: Your Honor, I object. That's outside the appropriate testimony from an expert witness.

THE COURT: Overruled.

[SELLARS'S COUNSEL]: He's not here to testify about credibility.

THE COURT: Overruled.

5

[HIGHFILL'S COUNSEL]: Mr. Jackson, let me ask the question again. As the expert hired by the plaintiff, based on your review, you found Mr. Voigt to be a credible witness?

A. Yes, I took everything he had to say at face value.

Q. You'll agree with Mr. Voigt, that Mr. Highfill, once he swerved to the left, **never was able to regain control of his vehicle before it shot across**?

A. **That's correct. <u>That's what he said</u>.**

Q. You'll agree with me that Mr. Voigt had the best vantage point of the happenings with respect to Mr. Highfill and the SUV prior to the collision?

A. Yes.

Q. In other words, there's no other witness in this case that had a better view of what happened?

A. That's correct.

(Emphases added.) The emphasized part of the testimony above is a precursor for his express limitation of his "endorsement" of Voigt's credibility three pages later during the same cross-examination:

Q. The SUV getting onto 71 all the way into his lane caused him to lose control; is that right?

A. No, sir, that's not what I said.

Q. Well, that's what Mr. Voigt's testimony is, you understand that?

A. I do.

Q. And you already told me under oath you thought Mr. Voigt was a credible witness.

A. Yes.

Q. And you didn't have any reason to dispute his testimony.

6

A. Well, that's an opinion that he made. I don't have any reason to dispute some of the facts that he said, like the vehicle got onto the highway. But that's two different kinds of statements. He made statements that he observed, and then he also made opinions. I disagree with his opinion in that issue. I don't disagree with some of the facts that he had to say about it, though.

That distinction concluded the expert's live trial testimony. Sellars asserts that Highfill also introduced Jackson's similar video deposition testimony during his case, which included the following exchange:

Q. Do you believe that Mr. Voigt was, in fact, driving his vehicle behind the vehicle driven by Mr. Highfill, who's deceased?

A. Yes. That's what he said several times.

. . . .

Q. Do you believe that Mr. Voigt witnessed this unknown SUV enter the highway and into Mr. Highfill's lane?

A. Yes. That's what his statements say.

. . . .

Q. And when Mr. Voigt—Mr. Voigt gave that sworn deposition testimony under oath, you believe him? And that is, you believe him when he says an SUV got onto the highway and got into Mr. Highfill's lane?

A. Yes. He seems very credible.

. . .

Q. And you believe Mr. Voigt with respect to what he saw, don't you?

A. Yes.

. . . .

Q. Okay. All right. So you—you agree, based on your investigation in this case, and your opinion is, you'll agree that Mr. Voigt saw Mr. Highfill lose his— lose control of his vehicle after the SUV went into his lane?

A. Yes.

These statements are consistent with Jackson's limited live endorsement of Voigt's testimony.

Bastrop police officer Daniel McManus did not include a third vehicle in his accident report, but said he could not discount Voigt's version. He testified by video deposition that he took statements from the ambulance occupants and another driver on the same side of the road. Though he concluded that "contributing factors" in the collision were that Highfill failed to maintain a single lane and went the wrong way on a one-way road, McManus testified that he did not know what caused Highfill to do those things. McManus testified that he did not mention a third vehicle in his crash report because he did not know of Voigt's observations when he prepared it; McManus said that he had no reason to disbelieve Voigt, just that he did not hear about Voigt's observations when he prepared the report. McManus said that no one asked him to alter his report after hearing Voigt's deposition testimony and that Voigt's testimony would not change the "contributing factors" listed in his report.

Sellars testified that, after hearing testimony from Voigt, the police officer, and Jackson, he believed that "only Mr. Highfill is responsible for this collision."

Sellars argues that Jackson exceeded his scope as expert and invaded the province of the jury to assess credibility. He contends that an expert assists the trier of fact when the expert's knowledge and experience are beyond the average juror's and the expert's testimony can help the trier of fact understand the evidence or determine a fact issue. *See K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000). Sellars cites to a line of Court of Criminal Appeals cases concluding that expert-witness testimony that a witness is truthful is inadmissible. *See* Tex. R. Evid. 702 (defining role of expert); *Sandoval v. State*, 409 S.W.3d 259, 291 (Tex.

8

App.—Austin 2013, no pet.) (compiling such cases). The jury is the sole judge of the credibility of the witnesses and may reconcile any inconsistencies in the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Erroneously admitted expert testimony that is crucial to a key issue is likely harmful. *State v. Central Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (op. on reh'g). Expert witnesses can be seen by the jury as an unbridled authority figure who is more credible than a lay witness. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 553 (Tex. 1995). We must evaluate the whole case, considering the state of the evidence, the strength and weakness of the case, and the verdict. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008). We look to see whether the erroneously admitted evidence was emphasized and whether it was calculated or inadvertent. *Service Corp. Int'l v. Guerra,* 348 S.W.3d 221, 236 (Tex. 2011).

Even if the trial court erred by allowing Jackson to testify that he found Voigt's testimony credible, we find no harm because—viewing his testimony and the record as a whole—Jackson limited his endorsement of Voigt's credibility in both his live and recorded testimony to the objective observation of the third vehicle's actions. Jackson's acceptance of Voigt's objective observations was implicit in Jackson's incorporation of the third vehicle into his accident reconstruction along with the observations of other witnesses. But on the crucial question of whether Voigt's negligence caused the collision with Sellars, Jackson expressly disagreed with Voigt's opinion that the third vehicle caused Highfill to lose control, opining instead that Highfill avoided the third vehicle without incident and lost control only after overcorrecting when returning to the main lane. Thus, Jackson did not vouch for Voigt's credibility on whether Highfill caused the accident—quite the opposite. The factual observations

9

on which Jackson vouched for Voigt's credibility are not the among the elements of the case, and Jackson undermined Voigt's credibility on the testimony pertinent to the elements of the negligence claim.

Not knowing which precise portions of the deposition excerpts Highfill replayed does not hinder Sellars's presentation or our review of the asserted error. Jackson made the disputed "endorsement" of Voigt's credibility in live testimony as well as in the recorded deposition. The video deposition excerpts played for the jury during the evidentiary phase were transcribed before trial and Sellars has specified the portions of the transcribed deposition testimony that he believes were erroneously admitted. If Highfill blurred the scope of Jackson's credibility testimony in closing argument by making selective edits, the transcribed deposition testimony was available for Sellars to use in rebuttal in his final argument and to preserve and present the argument for appeal. With this context, we find no harm in the admission of Jackson's testimony or in the absence from the record of what sections of the deposition excerpts Highfill chose to replay during argument.

Viewing the record as a whole, we cannot say that any error in the admission of Jackson's objected-to testimony probably caused rendition of an improper judgment.

**II.    The trial court did not abuse its discretion by allowing Highfill to play video excerpts of testimony during closing argument.**

Sellars asserts that the trial court committed reversible error by allowing Highfill to play excerpts from depositions during closing argument. Both sides used excerpts from video depositions in the evidentiary portion of their cases. When Highfill proposed to replay some video deposition excerpts in his closing argument, Sellars objected and argued that "[y]ou can use exhibits, but it's not appropriate to present testimony during your closing." He argued that

playing the recordings privileged video testimony because live witnesses could not be interjected into closing argument. On appeal, he expounds upon this theme, wondering why parties would call live witnesses when they could use recorded video during their case and closing. He speculates that courts might have to allow parties to record live testimony to balance the advantage of pre-recorded testimony. He contends that replaying the clips during argument gives juries access to nonverbal cues that are not available to them in the cold transcript of the videos. *See Good v. State*, 723 S.W.2d 734, 743-44 (Tex. Crim. App. 1986) (Teague, J., concurring).

We review a trial court's ruling on an objection to closing argument under the abuse-of-discretion standard. *In re Commitment of Hill*, 621 S.W.3d 336, 344 (Tex. App.—Dallas 2021, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Walker v. Baptist St. Anthony's Hosp.*, 703 S.W.3d 339, 343 (Tex. 2024). The Texas Rules of Civil Procedure provide that "[c]ounsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel." Tex. R. Civ P. 269(e); *Gregory v. Chohan*, 670 S.W.3d 546, 559 (Tex. 2023). The test for improper jury argument is whether the argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument. *See Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). Reversal is required only when the entire record shows that (1) the argument was improper, uninvited, unprovoked, and incurable by instruction, withdrawal, or trial-court reprimand and (2) the complaint about the argument was preserved. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). The party seeking reversal based on an allegedly improper argument must

show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. *Id*. at 840.

We need not decide whether playing the video deposition excerpts during argument was error because we conclude that playing them was harmless. The video recordings were played during the evidentiary phase, so they did not inject new testimony.[3] In *Atlantic Richfield Co. v. ANR Pipeline Co.*, the court held that the trial court did not err in allowing appellee to display enlarged photographs of various appellant's witnesses taken from still-frames in their deposition testimony, with statements attributed to each witness noted on the photograph. 768 S.W.2d 777, 785 (Tex. App.—Houston [14th Dist.] 1989, no writ). Much like Sellars's argument here, Appellant ARCO argued that the posters "forcefully imprinted on the minds of the jurors the false notion that ARCO's witnesses agreed with ANR's positions on every issue at trial." *Id.* ARCO argued that some statements were taken out of context to make it appear that the witness said the opposite of the witness's actual and repeated testimony. *Id.* The court of appeals affirmed the trial court's permission of the posters, concluding that ARCO offered no proof that the statement attributed to each witness was not based on testimony and, further, that ARCO did not request any limiting instruction governing the jury's use of the demonstrative aids. *Id*. The court of appeals found no error. *Id*. Similarly, here, Sellars did not object during argument that Highfill used excerpts that were not played during the evidentiary phase. Rather, in his brief, Sellars describes the excerpts played as "random, small bits of the same testimony . . . that was unexpectedly replayed" during argument.

---

[3] As discussed below, Sellars claims that the absence of a reporter's record transcription of the video excerpts played during argument prevented him from presenting his case. But Sellars was present during the argument and had the transcript of the video excerpts played at trial among the court's exhibits. Sellars did not object at trial that any portion played during argument had not been previously played during the evidentiary portion of trial.

12

This case is unlike the case in which the Court of Criminal Appeals held that the trial court, during argument in a robbery case, erred by allowing the playing of a YouTube video of a zoo lion trying to eat a baby through protective glass. *Milton v. State*, 572 S.W.3d 234, 242-43 (Tex. Crim. App. 2019). That video was not played during the evidentiary portion of trial, was not directly related to any evidence presented at trial, portrayed a different event than the crime charged, did not feature anyone involved in the crime, and did not convey information about the appellant's criminal history. *Id.* The court reversed the conviction after concluding that the video was outside the record and, as a demonstrative aid, improperly invited the jury to draw a highly prejudicial comparison between the defendant and the lion. *Id*. at 239, 244. In this case, there is no dispute that the deposition excerpts played during closing argument had been played during the evidentiary phase of the trial and pertained to the subject of the trial. Further, "[a]ll or part of a deposition may be used for *any purpose* in the same proceeding in which it was taken." *Id*. R. 203.6(b) (emphasis added). We conclude that Sellars has not shown harm from the trial court's allowing Highfill to play excerpts of video depositions played during the evidentiary stage of trial.

While we recognize the concerns about the potential abuse of the use of video deposition exhibits in closing argument, those are topics for a rules committee, not an intermediate appellate court. Video testimony can give more cues to jurors regarding the testimony and could potentially give an advantage to video-recorded testimony over live testimony. On the other hand, allowing counsel to read deposition excerpts during closing (as Sellars did) could let the reader place an inflection on the text different from that given by the

actual witness, in which case the video would be more accurate than reading the text.[4] Resolving such competing concerns is beyond the scope of this opinion. We conclude only that no harm has been shown in this case.

**III. Neither the reporter's failure to transcribe trial proceedings while Highfill played videotaped testimony during his closing argument nor this Court's denial of Appellant's Motion to Correct the Reporter's Record require reversal.**

Appellant contends that the absence of a recording and transcription of the video deposition excerpts replayed during closing argument hampered his ability to present his appeal and limited our review of the appeal. We have rejected a similar argument with respect to the admission of Jackson's testimony about Voigt's credibility above, and conclude that the absence of the transcription of the deposition excerpts replayed in argument does not require reversal.

Though we do not know which specific parts of the video deposition excerpts were replayed in Highfill's closing argument, that information (or its absence) did not factor into our analysis. The issue presented of whether video deposition excerpts can be played at all during closing argument did not turn on the content of the excerpts but on the medium in which they were presented. Our conclusion that the trial court did not abuse its discretion by allowing videos that had been played during the evidentiary phase to be replayed, in whole or in part, during argument was not affected by the absence of a reporter's record of the video replay section of the argument. Because the additional record was unnecessary to our review, any error

---

[4] We note that the rules provide that "[a] non-stenographic recording of an oral deposition, or a written transcription of all or part of such a recording, may be used to the same extent as a deposition taken by stenographic means." Tex. R. Civ. P. 203.6. If a party can read the text of a stenographic version of a deposition in closing argument, this rule implies that a non-stenographic recording can be used for the same purpose.

14

in the reporter's choice not to transcribe those segments of argument or in this Court's denial of Sellars's motion to correct the reporter's record by adding those selections is moot.

## CONCLUSION

We affirm the judgment.

_____
Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Theofanis and Ellis

Affirmed

Filed: August 22, 2025